UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LYNETTE BECH and MITCHELL MIRAGLIA, individuals, | ) ) ) | Case No: |
| Plaintiff, | ) ) | Judge: |
| v. | ) ) | Magistrate Judge: |
| STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS; and STEPHEN R. RUSSO, Interim Secretary, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## **COMPLAINT**

This is an urgent action brought to protect the rights of individuals with disabilities in context of the COVID-19 pandemic and the imminent shortage of medical equipment. As is set forth below, in the absence of Court intervention, vital medical equipment is likely to be steered away from individuals with disabilities.

Plaintiffs, LYNETTE BECH and MITCHELL MIRAGLIA, individuals, by and through their undersigned counsel, hereby file this Complaint and sue the STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, for nominal damages in an amount not to exceed $20.00 and attorneys' fees and costs pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. ("Rehabilitation Act" or "RA"); and sue STEPHEN R. RUSSO, in his capacity as Interim Secretary for injunctive and declaratory relief and attorneys' fees/costs under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. ("Americans with Disabilities Act" or "ADA") and the Rehabilitation Act and states as follows:

## JURISDICTION AND PARTIES

1.    This is an action for nominal damages in an amount not to exceed $20.00, injunctive and

       declaratory relief, and attorneys' fees/costs pursuant to the ADA and Rehabilitation Act,

       both of which are federal causes of action. This Court is vested with original jurisdiction

       pursuant to 28 U.S.C. § 1331 and 1343.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the discrimination

       which is the subject of this action occurred in Washington Parish and St. Tammany Parish,

       Louisiana, both of which are within the jurisdiction of the Eastern District of Louisiana.

3.    Plaintiff, LYNETTE BECH, (hereinafter referred to as "MS. BECH"), is a resident of

       Washington Parish, Louisiana. MS. BECH resides in Franklinton, Louisiana.

4.    MS. BECH is a qualified individual with a disability under the ADA.  MS. BECH is

       afflicted with osteogenesis imprefecta ("OI", also commonly known as "brittle bone

       disease").

5.    Due to her disability, MS. BECH is substantially impaired in several major life activities

       and requires a motorized wheelchair for mobility. Specifically, MS. BECH is unable to

       walk or stand without assistance.

6.    Plaintiff, MITCHELL MIRAGLIA, is a person of the age of majority and a citizen of the

       State of Louisiana.

7.    Plaintiff, MITCHELL MIRAGLIA, is a resident of St. Tammany Parish, Louisiana.

8.    MR. MIRAGLIA is a qualified individual with a disability under the ADA.

       MR. MIRAGLIA has cerebral palsy and quadriplegia.

9.    Due to his disability, MR. MIRAGLIA is substantially impaired in several major life

activities and requires a motorized wheelchair to ambulate.

10.     Defendant STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS is the political entity responsible for protecting, promoting, and ensuring access to medical, preventive, and rehabilitative services for all citizens of the State of Louisiana (hereinafter "Department of Health").

11.     Defendant STEPHEN R. RUSSO (hereinafter "RUSSO") is the Interim Secretary of the Department of Health, is the current head official of said governmental entity, and is sued herein pursuant to the doctrine of *Ex parte Young*.

12.     Defendants are responsible for complying with the obligations of the ADA/RA.

13.     The Department of Health is a public entity and, as such, is subject to the ADA/RA.

14.     RUSSO is the chief executive and is sued solely under the doctrine of *Ex parte Young* because he has the ability to enforce Orders issued by this Court.

15.     All events giving rise to this lawsuit occurred in the State of Louisiana.

## FACTUAL BACKGROUND

### The Responsibilities of the Louisiana Department of Health

16.     The Department of Health is a Louisiana state agency with a budget of approximately $14 billion and approximately 6,300 employees.

17.     According to the Department of Health, its mission "is to protect and promote health and to ensure access to medical, preventive, and rehabilitative services for all citizens of the State of Louisiana."

18.     According to the Department of Health, its organizational goals are to:

- PROVIDE QUALITY SERVICES
- PROTECT AND PROMOTE HEALTH

3

- DEVELOP AND STIMULATE SERVICES BY OTHERS
- UTILIZE AVAILABLE RESOURCES IN THE MOST EFFECTIVE MANNER

19. As part of its mission and organizational goals, the Department of Health regularly issues and publishes guidance and resource documents for use by members of the public and for use by medical and healthcare providers.

20. Upon information and belief, the guidance documents and materials published by the Department of Health on its website are widely circulated and utilized by medical and healthcare providers in Louisiana to determine their obligations and responsibilities.

21. The publication of guidance documents and materials—and the information and instructions contained in those documents—promotes the general public's convenience and safety by overcoming a collective action problem and allowing citizens to focus on other venues.

22. The publication of guidance documents and materials—and the information and instructions contained in those documents—is a program, service, or activity of the Department of Health.

<u>Facts Related to the COVID-19 Epidemic</u>

23. COVID-19 is a respiratory illness caused by a novel coronavirus first identified during an investigation into an outbreak in Wuhan, China in November 2019. Experts believe that COVID-19 emerged from an animal source.

24. Symptoms of COVID-19 include fever, cough, and shortness of breath. Some patients develop severe complications such as pneumonia in both lungs, multi-organ failure, and death. The preliminary outcomes among patients with COVID-19 in the United States

4

indicate that the fatality rate was highest among persons over the age of 85.

25.   COVID-19 is spread mainly through people who are in close contact with one another through respiratory droplets produced when an infected person coughs or sneezes. It may also be possible for a person to get COVID-19 by touching a surface that has the virus on it and then touching their own mouth, nose, or eyes.

26.   According to the Centers for Disease Control and Prevention ("CDC"), the period of time it takes for the number of COVID-19 cases to increase by a factor of two is six to seven days. Unless populations are able to slow the exponential growth, the caseload has the potential to overload healthcare systems very quickly.

27.   At present, there is no specific antiviral treatment for COVID-19. Also, there is currently no vaccine to protect against COVID-19.

28.   COVID-19 has rapidly spread across the globe with cases reported in at least 199 countries. On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak could be characterized as a pandemic. At the time of filing, there are over 580,000 confirmed cases worldwide with over 26,500 deaths reported.

29.   The first case of COVID-19 in the United States was reported on January 21, 2020 in Washington State. By March 17, 2020, there were cases of COVID-19 reported in all 50 states and the District of Columbia.

30.   On March 13, 2020, President Trump issued a proclamation that the COVID-19 outbreak in the United States constituted a national emergency. President Trump noted that the spread of COVID-19 could strain the United States' healthcare system.

31.   One of the countries hit the hardest by COVID-19 is Italy. As of the time of this filing,

Italy has over 86,000 cases of COVID-19 reported with more than 5,909 deaths. The rapid spread of COVID-19 has overwhelmed the healthcare system in Italy and many healthcare experts are concerned that the United States could be next.

32.    On March 26, 2020, the United States became the country with the highest number of reported cases of COVID-19 of any country. As of the time of this filing, there are over 96,000 confirmed cases in the United States and more than 1,400 deaths reported.

<u>The State of Louisiana's Response to the COVID-19 Epidemic</u>

33.    The first presumptive positive case of COVID-19 in Louisiana was reported on March 9, 2020. The number of presumptive positive cases continued to grow to 13 over the following two days. Governor Edwards declared a Public Health emergency on March 13, 2020.

34.    On March 12, the Louisiana Department of Health required all licensed healthcare facilities to restrict visitors to those deemed essential to the care of patients, clients, and residents.

35.    Governor Edwards signed a statewide proclamation on March 13, 2020 that closed all K-12 public schools and halted gatherings of more than 250 people until April 13, 2020.

36.    On March 14, 2020, the first COVID-19 related death was reported in Louisiana. At that time, there were 77 presumptive positive cases of COVID-19.

37.    Governor Edwards increased the measures to reduce the spread of COVID-19 on March 16, 2020 by banning gatherings of more than 50 people, closing casinos, bars, and movie theaters, and limiting restaurants to delivery, take-out and drive-thru only.

38.    On March 19, 2020, Governor Edwards warned that parts of the state could run out of

resources to provide health care in seven to ten days without help from the federal government.

39.   By March 21, 2020, the number of COVID-19 deaths climbed to a total of 20 with 763 cases reported.

40.   On March 22, 2020, Governor Edwards issued a statewide "Stay at Home Order" in an effort to further fight the spread of COVID-19. The order went into effect on 5 p.m. on March 23, 2020.

41.   Data compiled by an economist at the University of Louisiana at Lafayette indicated that Louisiana's number of confirmed COVID-19 cases grew 67.8 per cent in the first two weeks after the initial diagnosis on March 9, 2020. The growth rate in Louisiana is similar to Italy and Spain in number of cases after 100 positive tests.

42.   On March 23, 2020, Governor Edwards made a request to President Trump for a statewide Major Disaster Declaration in response to the spread of COVID-19 in Louisiana. In his request, Governor Edwards stated, "Louisiana's current health care delivery system is quickly getting to the point where they are at capacity because of the treatment of COVID-19 patients."[1]

43.   President Trump declared a major disaster exists the State of Louisiana on March 24, 2020 and ordered federal assistance. The same day, Governor Edwards announced that COVID-19 hospitalizations could overwhelm the healthcare system's capacity in the New Orleans area by April 4, 2020.

---

[1] *See* https://gov.louisiana.gov/assets/docs/covid/Request-for-Major-Declaration-COVID-19.pdf (last visited March 27, 2020).

7

44.    Orleans Parish has the highest rate of COVID-19 deaths per capita in the United States at

the time of this filing.

45.    As of the date of this filing, there are 2,746 positive cases of COVID-19 reported, with

119 deaths.

## COUNT I
## VIOLATION OF TITLE II OF THE ADA
### (as to defendant RUSSO only)

46.    On Wednesday, March 18, 2020, in recognition of the increasing spread of the COVID-19

pandemic across the State of Louisiana, attorney Andrew D. Bizer sent a public records

request to the Department of Health requesting the following documents:

> If the Louisiana Department of Health has issued any memorandum, emails, policy documents, or guidance documents related to a "COVID-19 screening criteria" that excludes from critical care any patients with Spinal Muscular Atrophy, individuals who require assistance with activities of daily living, or chronic ventilatory support, please produce a copy of any such documents.  To be clear, if there is any written policy or procedure to not give critical care to these patients, please produce any and all copies of said policy or procedure.

> If the Louisiana Department of Health has issued any memorandum, emails, policy documents, or guidance documents related to a "COVID-19 screening criteria" persons with severe or profound intellectual disability, suggesting that said individuals are unlikely candidates for ventilator support, please produce a copy of any such documents. To be clear, if there is any written policy or procedure to not give critical care to these patients, please produce any and all copies of said policy or procedure.[2]

47.    This public records request was received by the Department of Health, as is evidenced by

the fax confirmation page in undersigned's possession.

48.    The public  records request sought any memorandum, emails, policy documents, or

---

[2] *See* Exhibit "1."

guidance documents which instructed Louisiana hospitals and healthcare provided to "not give critical care" to patients with Spinal Muscular Atrophy, individuals who require assistance with activities of daily living, or chronic ventilatory support.

49.  The purpose of this request was to investigate whether the Department of Health was instructing hospitals and medical providers to steer ventilators and other lifesaving medical equipment to non-disabled individuals in lieu of equally distributing said equipment to disabled and non-disabled individuals.

50.  Having received no response, on Tuesday, March 24, 2020, Mr. Andrew Bizer sent a "request for reasonable accommodation / modification" to the State of Louisiana, Department of Health on behalf of three clients with disabilities, including Ms. Bech and Mr. Miraglia, both of whom are named plaintiffs in this action.

51.  The letter sent by Mr. Bizer is attached hereto as Exhibit "2."[3]

52.  The request for accommodation was sent via fax, email, and US mail. Undersigned has a copy of the fax confirmation page. Further, the request for accommodation was emailed to two officials at the Department of Health. Undersigned received no email "bounce back." As such, the request for reasonable accommodation was received by Defendants.

53.  In their request for reasonable accommodation, Ms. Bech and Mr. Miraglia outlined "the imminent shortage of critical, lifesaving facilities and medical equipment, especially hospital beds, ICU space, and ventilators[.]"

54.  In their request for reasonable accommodation, Ms. Bech and Mr. Miraglia outlined that

---

[3] The third plaintiff opted to not join as a plaintiff. For said individual's privacy, his name and information have been redacted in Exhibit "2."

9

they were "aware and grateful of the herculean efforts that healthcare providers, the Louisiana Department of Health, and other essential businesses and personnel are undertaking to combat the COVID-19 epidemic in Louisiana."

55.     Ms. Bech and Mr. Miraglia went on to explain that:

> Our hope is that through this request for reasonable accommodation, we can ensure that the rights of individuals with disabilities are protected during this unprecedented moment in Louisiana history. We are happy to engage with your attorney or non-medical staff regarding this request for reasonable accommodation / modification to ensure that only the minimally necessary amount of valuable healthcare personnel time is spent responding to this request.

56.     Ms. Bech and Mr. Miraglia then outlined the core basis for their concern, namely, that (1) that Louisiana is facing an imminent shortage of critical, lifesaving facilities and medical equipment, especially hospital beds, ICU space, and ventilators; (2) that a Louisiana healthcare provider was quoted as stating that "if you only have one ventilator, and you have two patients, you're going to have to go with the one who has a higher likelihood of surviving."

57.     Ms. Bech and Mr. Miraglia went on to explain that news reports indicate that "hospitals have scoring systems or clinical scores to prioritize care and that these scoring metrics may take into consideration additional illness that could shorten a person's life expectancy."

58.     Ms. Bech and Mr. Miraglia further stated that "We are writing concerning these triage procedures and the need for them to be administered fairly and without regard to disability."

59.     Ms. Bech and Mr. Miraglia then outlined the nature of their disabilities and explained how they are qualified individuals with disabilities.

60.     The request for accommodation went on to state:

Each of my clients have a disability and, as such, are at risk of facing prejudice, stereotype, or speculation about their comorbidity rate if they become infected with COVID-19. Additionally, while I am not a medical professional and thus cannot opine as to medical issues, it is possible that some or all of my clients have a lower chance of survival when compared to a similarly-situated non-disabled persons *because of a disability-related condition*. As is set forth below, these disability-related conditions should not be considered under federal civil rights law.

61.    Ms. Bech and Mr. Miraglia then outlined the legal requirements of the ADA and RA, both

of which prohibit discrimination on the basis of disability.

62.    Ms. Bech and Mr. Miraglia proceeded to explain the following:

Treatment allocation decisions cannot be made based because a person with a disability has a lower prospect of survival *as a result of their disability*. While the possibility of a person's survival may receive some consideration in allocation decisions, that consideration must be based on the prospect of surviving the condition for which the treatment is designed—in this case, COVID-19—and not other disabilities. In addition, it must be based on a clear indication from the person's individual circumstances, interpreted according to the best available medical evidence in a manner free from bias, that the person will die in the very short term whether treatment is provided or not.

➢    If a medical provider is faced with two patients, one with a disability and one without a disability, both of whom need a ventilator, the decision as to who to provide the ventilator to must be made without consideration of mortality risks that are related to that individual's disability.

➢    Thus, for example, if the person without a disability has a 75% chance of survival and the person with a disability has a 50% chance of survival, and both need the one remaining ventilator, the healthcare provider cannot default to providing the ventilator to the individual without a disability. Instead, the healthcare provider must first assess *why* the individual with a disability has a lower chance of survival. If the reason for the 25% differential is because of a disability-related condition, the ventilator must be allocated based on other grounds (*e.g.*, first-come first serve, random lottery, non-disability related organ capacity, prioritization of healthcare professionals).

➢    There are numerous, non-discriminatory methods, procedures, or basis through which scarce resources can be allocated. For example, it likely would not be discriminatory for a healthcare provider to prioritize non-smokers over smokers. Smoking is not a disability or a protected class. Further, reports appear to suggest that smoking is a comorbidity for

11

increased risk of fatality from COVID-19. The ADA, RA, and ACA do not prohibit or stop healthcare professionals from using their medical judgment or rationale. Instead, these statutes simply require that steps be taken to ensure that persons with disabilities are put on "equal footing" with their non-disabled peers.

63.  Ms. Bech and Mr. Miraglia stated that they were enclosing "a letter that was issued by the National Council on Disability, a federal government agency, which outlines many of the same concerns addressed herein."

64.  Ms. Bech and Mr. Miraglia also stated that they were enclosing article entitled, *May Hospitals Withhold Ventilators from COVID-19 Patients with Pre-Existing Disabilities?* which was published by Samuel R. Bagenstos on March 24, 2020.

65.  The central takeaway of Mr. Bagensros' article is that the question as to whether individuals with disabilities should have equal access to scarce healthcare resources has already been answered in the affirmative through the legal mandates and requirements of the ADA and RA.

66.  In his article, Mr. Bagenstos pointed out that ensuring that the requirements of anti-discrimination laws are followed—even in the face of a widespread pandemic—ensures that the very basic fabric of our society is preserved: "democratic legitimacy."

67.  Mr. Bagenstos pointed out that the requirements of the ADA were passed by Congress in its legislative capacity.

68.  Thus, in determining how scarce healthcare resources should be allocated, it is not permissible for healthcare providers to default to an allocation strategy that violates the requirements of the ADA and RA.

69.  As Mr. Bagenstos pointed out, the decision by Congress in determining that individuals

with disabilities must be treated equally has more "legitimacy than a decision by those operating the health care system to place the burden of resource scarcity on disabled individuals—the very individuals who are most likely to have been excluded from decisions like that."

70.   In their request for accommodation letter, Ms. Bech and Mr. Miraglia went on to explain that they are at risk of being subject to discriminatory criteria, stereotypes, or methods of administration absent an accommodation by the Department of Health.

71.   Ms. Bech and Mr. Miraglia proceeded to request that the State of Louisiana, Department of Health accommodate their disabilities by taking the following actions:

- Sending a detailed memorandum and/or guidance document to healthcare providers in Louisiana outlining their obligation federal law to protect the rights of all patients, including those with disabilities, during the COVID-19 pandemic. Guidance is needed within hours or days, not weeks or months given that Louisiana is at the epicenter of the U.S. epidemic—the pandemic is spreading at a rapid pace, and the number of confirmed cases and deaths is climbing each day.

- Confirming to undersigned counsel that the above memorandum and/or guidance document has been sent to all hospitals and healthcare personnel who are actively treating COVID-19 patients.

- Engaging in an interactive dialogue with Ms. Bech, [REDACTED], and Mr. Miraglia, through their counsel of record, in the event the Department of Health believes that the above request cannot be accommodated.

72.   Ms. Bech and Mr. Miraglia explained that they expected "to receive a response from the State of Louisiana, Department of Health by no later than Friday, March 27, 2020, at 10:00 a.m. indicating whether the relief requested in this letter will be provided."

73.   Providing Plaintiffs' requested accommodation is entirely consistent with the Department of Health's mission, which is "to ensure access to medical, preventive, and rehabilitative services for all citizens of the State of Louisiana."

74.     Plaintiffs' requested accommodation would not have imposed an undue financial or administrative burden on Defendants. Plaintiffs and their counsel offered to speak and communicate with the Department of Health through its attorneys and/or non-healthcare workers instead of through "first line responders."

75.     The deadline imposed in Plaintiffs' request for accommodation/modification has passed and Defendants have not indicated that they have or will provide the requested accommodation.

76.     A review of the Department of Health's website does not indicate the posting or publication of any guidance materials or documents related to the non-discrimination against individuals with disabilities.

77.     At no point did any official, employee, representative, spokesperson, or attorney reach out to counsel for Ms. Bech or Mr. Miraglia about their request for reasonable accommodation.

78.     At no point did any official, employee, representative, spokesperson, or attorney engage in a dialogue with counsel for Ms. Bech or Mr. Miraglia about their requested reasonable accommodation.

79.     Given the widespread and exponential growth rate of COVID-19 infections, there is a significant and material risk that Ms. Bech and Mr. Miraglia will be infected with COVID-19.

80.     Given the large number of COVID-19 cases that require hospitalization, ICU treatment, and intubation, there is a significant and material risk that Ms. Bech and Mr. Miraglia will need access to these scarce hospital resources in the near future.

81.     Absent the provision of their requested reasonable accommodation, Ms. Bech and

14

Mr. Miraglia are at risk of being denied access to hospitalization, ICU treatment, or intubation. Specifically, absent the provision of their requested accommodation, healthcare providers will likely default to a policy or procedure of providing their scarce resources to individuals "who has a higher likelihood of surviving."

82. Absent the provision of their requested reasonable accommodation, Ms. Bech and Mr. Miraglia are at significant and material risk of injury or death due to scarce resources being allocated to non-disabled persons in a discriminatory manner.

83. Indeed, the risk of Louisiana healthcare providers defaulting to an allocation policy that favors those "who has a higher likelihood of surviving" is increased as a result of the language in a guidance document entitled *Scarce Resource Management & Crisis Standards of Care* (hereinafter "*Scarce Resources*"). This document was authored by the Washington State Department of Health and Northwest Healthcare Response Network, but it was recently published on the Louisiana Department of Health's website. This publication indicates approval and ratification by the Louisiana Department of Health of the guidance and instructions set forth in the *Scarce Resource Management* document.

84. According to *Scarce Resource Management*, page 21, during Crisis Capacity, a hospital should engage in a "re-allocation" strategy. The recommendation for a re-allocation strategy is to "Assign Limited Ventilators to Patients Most Likely to Benefit if No Other Options are Available. See Pediatric and/or Adult Critical Care Algorithm."

85. This algorithm is set forth on page 33 of *Scarce Resource Management*, which instructs that Step 1 is to "Screen Patient for ICU Care after reviewing patient's end of life directive / POLST or similar living will agreements"

15

86.    The Step 1 screening is explained on page 34 of *Scarce Resource Management*, which instructs healthcare providers to consider transferring a delineated list of patients for out-patient or palliative care instead of care at an ICU, including "Baseline functional status (consider loss of reserves in energy, physical ability, cognition and general health)"

87.    Quite simply, according to this algorithm, healthcare professional can "screen out" individuals who they deem as having insufficient baseline functional status—even when that baseline functional status is a result of "physical ability" or "cognition."

88.    The document does not explain to what degree of impairment an individual's "baseline functional status" must be before being screened out based on their physical abilities and cognition.

89.    The algorithm promulgated by Washington State, and re-published by the Louisiana Department of Health, encourages healthcare providers to violate the ADA. Specifically, *Scarce Resource Management* encourages covered entities to violate 28 C.F.R. § 36.301(a), which prohibits the imposition of "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations…"

90.    Absent the publication of new guidance materials by the Department of Health, it is reasonably foreseeable that Louisiana healthcare providers will rely upon the guidance and instructions in *Scarce Resource Management* in allocating scarce healthcare resources.

91.    By and through the facts set forth above, Ms. Bech and Mr. Miraglia requested a reasonable accommodation.

16

92. Defendants constructively denied Ms. Bech and Mr. Miraglia's request for reasonable accommodation by failing to respond within a reasonable time after its receipt.

93. Defendants denied Ms. Bech and Mr. Miraglia's request for reasonable accommodation by failing to provide the requested accommodation.

94. By failing to provide Ms. Bech and Mr. Miraglia with a reasonable accommodation, Defendants violated 28 C.F.R. § 35.130(b)(1).

95. By and through the facts set forth above, Defendants are aiding and perpetuating discrimination against qualified individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(1)(v).

96. By and through the facts set forth above, Defendants are imposing or applying an eligibility criteria that screens out or tends to screen out individuals with disabilities from fully and equally enjoying a service, program, or activity, in violation of 28 C.F.R. § 35.130(b)(8).

97. By and through the facts set forth above, Defendants failed to engage in a good faith, interactive dialogue with Ms. Bech and Mr. Miraglia.

98. There is an urgent need for immediate injunctive relief. Absent injunctive relief, it appears virtually certain that the Department of Health will persist in promoting an algorithm that encourages usage of "physical ability" as an eligibility criterion. Absent injunctive relief, it appears unlikely that Defendants will instruct healthcare providers and hospitals in Louisiana on their obligations under the ADA/RA.

99. 42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132

of this title."

100.    With regards to their request for nominal damages, it is Plaintiffs' position that even an award of nominal damages would confer significant civil rights to the public, as a judgment in their favor against the Department of Health, regardless of the amount, would deter the Department of Health from discriminating against individuals with disabilities in the future.

101.    Plaintiffs have retained the undersigned counsel and are entitled to recover reasonable attorneys' fees, costs and litigation expenses from Defendants pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

**COUNT II**
**VIOLATION OF THE REHABILITATION ACT**
**(as to both Defendants)**

102.    Plaintiffs adopt and re-allege the allegations contained in paragraphs 1-101 as if fully stated herein.

103.     Plaintiffs brings this claim against Defendants, based upon the Rehabilitation Act, 29 U.S.C. §794, *et seq*.

104.    The Rehabilitation Act provides that:

> No otherwise qualified individual with handicaps in the United States, as defined by 7(8) [29 USCS § 706(8)], shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the

United States Postal Service.  29 U.S.C. § 794(a).

105. For the same reasons that Defendants committed discrimination under the ADA, as is set forth above, Defendants committed discrimination under the RA.

106. Upon information and belief, the Department of Health is a recipient of federal funds.

107. Plaintiffs seek injunctive relief from defendant RUSSO, for the same reasons injunctive relief is appropriate under the ADA.

108. In addition, Ms. Bech and Mr. Miraglia seek a recovery of nominal damages from the Department of Health, in an amount not to exceed $20.00.

109. As a recipient of federal funds, the Department of Health is liable for damages to Plaintiffs as a result of its acts and omissions constituting intentional discrimination.

110. By and through their choices and actions outlined above, the Department of Health committed intentional discrimination.

111. By and through their failure to respond to Ms. Bech and Mr. Miraglia's requests for reasonable accommodation/modification letters, the Department of Health committed intentional discrimination.

112. The Department of Health had notice of its need to accommodate Ms. Bech and Mr. Miraglia and it has failed to provide reasonable accommodations. In fact, the Department of Health has failed to engage in a good faith interactive dialogue.

113. Plaintiffs have been obligated to retain undersigned counsel for the filing and prosecution of this action. Plaintiffs are entitled to recover their attorneys' fees, costs and litigation expenses from Defendants pursuant to 29 U.S.C. §794(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.     That this Court declare that Defendants violated the ADA and RA.

B.     That this Court issue a preliminary and permanent injunction against defendant RUSSO, and any successors, to bring the Department of Health into compliance with the requirements of the ADA and RA. Such injunctive relief may include, but is not limited to:

    i.     Developing and sending a detailed memorandum and/or guidance document to healthcare providers in Louisiana outlining their obligations federal law to protect the rights of all patients, including those with disabilities, during the COVID-19 pandemic.

    ii.    Removing references to the algorithm promulgated by Washington State in *Scarce Resource Management* that suggest and/or encourage the usage of disability-related conditions, such as "physical ability" or "cognition."

    iii.   Confirming to undersigned counsel that the above memorandum and/or guidance document has been sent to all Louisiana hospitals and healthcare personnel who are actively treating COVID-19 patients.

    iv.    Engaging in an interactive dialogue with Ms. Bech and Mr. Miraglia, through their counsel of record, to ensure that the guidance documents/materials are consistent with the requirements of the ADA.

C.     That this Court awards nominal damages pursuant to 29 U.S.C. § 794a(a)2 against the Department of Health, in an amount not to exceed $20.00.

D.     This Court award of reasonable attorneys' fees, costs and litigation expenses against Defendants pursuant to 29 U.S.C. § 794a(a)2 and 42 U.S.C. § 12205.

E.     Such other relief as the Court deems just and proper, and/or is allowable under the ADA and Rehabilitation Act.

Respectfully Submitted,

By:/s/  Garret S. DeReus

BIZER & DEREUS, LLC
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA#
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

21